UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:                                          Case No. 10-53029-SWR

**DOUBLE G RANCH, LLC,**                        Chapter 11

     Debtor.                                   HON. STEVEN W. RHODES
_____/

### UNITED STATES TRUSTEE'S MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE OR FOR APPOINTMENT OF EXAMINER

     Daniel M. McDermott, United States Trustee for Region 9, in furtherance of the administrative responsibilities imposed by 28 U.S.C. § 586(a), files this Motion for Appointment of Chapter 11 Trustee or for Appointment of Examiner pursuant to 11 U.S.C. §§ 1104(a) and 1104(c). In support of this motion, the United States Trustee states as follows:

### Jurisdiction and Introduction

     1.     The Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334.

     2.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

     3.     Debtor, Double G Ranch, LLC ("Debtor" or "Double G") filed its petition for relief under chapter 11 of the United States Bankruptcy Code[1] on April 20, 2010.  The petition for relief was signed by Peter J. Graves, as president of the Debtor.

     4.     On April 21, 2010, Peter J. Graves filed his personal petition for relief under Chapter 11 (case number 10-53046-SWR).

---

[1] 11 U.S.C. § 101 *et seq*.  Unless otherwise noted, the word "Code" as used in this motion refers to the Bankruptcy Code, and the word "section" refers to the corresponding section of the Code.

5.     The section 341 meeting of creditors, in this case, was held on May 27, 2010. Debtor appeared by its president, Peter J. Graves. Mr. Graves was sworn to testify under penalty of perjury, and was examined by the undersigned as the representative of the United States Trustee.

6.     The section 341 meeting of creditors, in the case of Peter J. Graves, was held on June 15, 2010. Mr. Graves was sworn to testify under penalty of perjury, and was examined by the undersigned as the representative of the United States Trustee. A transcript of Mr. Graves' section 341 meeting is attached hereto as Exhibit A.

7.     Mr. Graves testified that he is a founding member of Debtor G Ranch, LLC, its president and treasurer and one of two managing partners [members]. His primary duties have been to raise funds for the Debtor, to handle investor relations associated with the borrowing and to manage the company along with Lawrence Grinnell, the other managing member. Exhibit A at 6, and 7.

8.     Mr. Graves described himself as having been an entrepreneur for a long time. He approached "friends, family, colleagues" who had known him for many years and "offered them the chance to either be a lender to Double G Ranch or a long-term investor in any of [its] projects." Some of these individuals knew Mr. Graves very well but "didn't know a start-up company, and ... were extremely at ease lending [Mr. Graves] money personally as opposed to a company that they ... knew nothing about." Accordingly, these individuals loaned funds to Mr. Graves with the expectation that he would "(p)ut it into the company ... [i.e.] could loan it into the company." Exhibit A at 7, 8, and 26.

9.     Funds received by Mr. Graves from individuals investing with him in the Debtor were deposited in an account in his name, a check would be written on that account and deposited in an

account of the Debtor. The transaction would appear on the Debtor's books as an account payable to Mr. Graves. Exhibit A at 24.

10.     However, Mr. Graves also testified, both at his meeting of creditors and the prior Double G Ranch, LLC meeting of creditors, that all funds received by him for investment in Double G were not necessarily deposited with Double G. Mr. Graves testified that "(f)or – for example, if someone loaned me $50,000, I might – might take 30,000 of it and put it into Double G Ranch. The other 20,000 I might turn around and pay interest payments on behalf of Double G Ranch or my loan ledger with – with those people." Exhibit A at 18, 19, 29, and 30.

11.     The Debtor's Amended Schedule F, filed May 12, 2010, (Docket # 23) lists a debt of $690,079.87 due Mr. Graves for "Loans made to the Debtor" and a debt in an unknown amount due Mr. Graves for "carrying costs for Debtor." Mr. Graves testified that he personally invested $500,000 to $700,000 of his own money in the Debtor. Exhibit A at 23. The Schedule F filed in Mr. Graves' personal proceeding lists total debts of $7,361,237.59 of which $7,097,188.00 are liabilities variously described as original promissory notes, personal guarantees of additional interest for a Double G Ranch, LLC loan, personal guarantees for loan given to Double G Ranch, LLC, or personal loan associated with Double G Ranch, LLC. Mr Graves testified that he has paid over $5,000,000.00 to individual lenders in interest without any reimbursement from Double G. Exhibit A at 46. At least some of the payments made were on notes with interest rates of up to 12 per cent and an additional commission of 6 per cent. Exhibit A at 45.

12.     Although Mr. Graves testified that his records are "immaculate," Exhibit A at 22, he also stated that it would not be possible to reconcile the [approximately] $690,000.00 due him from the Debtor with the [approximately] $7,300,000.00 in debts listed on Mr. Graves' Schedule F. He

3

stated "No. No, I don't think it would be, no. There's too many in-and-out entries. I mean -- each year. For example, as I've stated before, as -- as these loans came in and I moved money over to Double G Ranch when interest payments were made and so forth, if there wasn't any money in the Double G Ranch account but there was money in Peter Graves account, I would turn around and pay the interest to these people out of the Peter Graves account; **it never hit the Double G Ranch books. That's just one example of many.**" Exhibit A at 25. (Emphasis added.)

13.      Mr. Graves testified that interest paid on the notes which he issued for funds paid to him and invested in the Debtor were not reported on Forms 1099 to the Internal Revenue Service either by him or by Double G. Exhibit A at 17.

## Grounds for Relief

## Appointment of Chapter 11 Trustee

14.      Motions seeking appointment of a chapter 11 trustee are generally governed by § 1104(a) of the Code, which provides in pertinent part:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court **shall** order the appointment of a trustee–
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets and liabilities of the debtor.

(Emphasis added).

4

15.     Once a court determines that the facts as presented establish cause in the context of section 1104(a)(1), the statute mandates that the court "shall" appoint a trustee. *In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir. 1988). *See Escoe v. Zerbst*, 295 U.S. 490, 493 (1935)("shall" is the language of command; its use in a statute indicates intent that the statute should be mandatory). The Code does not attempt to give an all-inclusive definition of what constitutes cause for the appointment of a chapter 11 trustee. Rather, the Code recognizes that what constitutes sufficient cause for the appointment of a chapter 11 trustee is a question of fact. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3rd Cir. 1989), *7 Collier on Bankruptcy* ¶ 1104.02[3][a] (15th Ed. Rev.).

16.     Peter Graves was a founding member of Double G Ranch, LLC, has been a managing member of Double G Ranch, LLC since its founding and retains that position today as does the other managing member.

17.     Inadequate record keeping constitutes cause for the appointment of a chapter 11 trustee. *See In re Philadelphia Athletic Club, Inc.,* 15 B.R. 60 (Bankr. E.D. Pa. 1981); *Oklahoma Refining Co., supra* and the cases cited therein. Mr. Graves' testimony that his "immaculate" records regarding funds of $7,097,188.00 owed by him to investors and due him from Double G Ranch, LLC, could not be reconciled with the records of Double G regarding what it owed Mr. Graves, $690,079.87 plus a second "unknown" amount. Given the wide discrepancy in these figures and Mr. Graves' representation that his records are immaculate, the records of Double G Ranch, LLC are obviously inadequate.

18.     *Philadelphia Athletic Club, supra,* provides that the commingling of a debtor's assets with those of another entity is cause for the appointment of a trustee. Mr. Graves' testimony that funds paid to him for investment in Double G Ranch, LLC were at times paid as interest to previous

5

investors, from his own bank account, having "never hit the Double G Ranch books," is further evidence of the inadequacy of Double G's records and, at the very least, clearly a commingling of Mr. Graves' funds with those of the Debtor. At worst, this testimony is evidence of a Ponzi scheme. In either case, the appointment of a chapter 11 trustee is clearly warranted.

19.     Mr. Graves' testimony that interest paid on the notes which he issued for funds paid to him for investment in the Debtor were not reported on Forms 1099 to the Internal Revenue Service either by him or by Double G reveals violations of 26 U.S.C. § 6041 and/or § 6049. The magnitude of these violations is illustrated by Mr. Graves' testimony that he has paid over $5,000,000.00 to individual lenders in interest without any reimbursement from Double G. This, however, is only the minimal extent of the violations, as the amounts paid by Double G to these lenders, through Mr. Graves, was also not reported. These failings obviously constitute gross mismanagement and also warrant the appointment of a chapter 11 trustee.

20.     If the Court does not find sufficient cause for the appointment of a chapter 11 trustee under Section 1104(a)(1) , the United States Trustee requests that the Court exercise its discretion under the lesser standard set forth in section 1104(a)(2) to appoint a trustee in light of the facts set forth above. Under section 1104(a)(2), the Court need not find that any of the factors set forth in section 1104(a)(1) as a predicate to ordering the appoint a trustee; it is sufficient that the appointment be in the best interest of creditors. *Oklahoma Refining Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133 (10th Cir. 1988). The best interests of creditors in this case will be served by appointment of an independent third party to properly administer Debtor's chapter 11 estate. Certain of the creditors have publicly expressed their outrage at Mr. Graves  both personally and as a managing member of the Debtor. Exhibit A at 40, 43 and 52. Additionally, six of the seven members of the

6

creditors' committee appointed in Mr. Graves proceeding have resigned from the committee and, upon information and belief, at least some of these individuals have joined an ad hoc group to pursue allegations of misconduct by Mr. Graves. Acrimony between a debtor in possession's management and the creditors that impedes the reorganization effort has been found to constitute grounds for appointing a trustee. *See Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) ("The district court concluded that 'there is no reasonable likelihood of any cooperation between the parties in the near future.'" ... [T]he district court did not clearly err ... when it found a deep conflict to exist between the ...debtor-in-possession and the creditors in bankruptcy.").

## **Appointment of an Examiner**

21.    Section 1104(c) of the Code provides for the appointment of an examiner in chapter 11 cases, and provides in pertinent part:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest, or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if -
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

22.    The Debtor's Amended Schedule F liabilities total $10,400,692.30. None of the Schedule F liabilities included in this amount are described as contingent or unliquidated. No debts for goods or taxes are listed in Schedule F. Liabilities for services total $183,154.43. Scheduled debts due insiders, Peter J. Graves and Timothy McKay, with liquidated amounts, total

7

$1,262,780.87. Accordingly, Debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes equal $8,954,757.00. Accordingly, the appointment of an examiner is required in this case if the Court does not appoint a trustee.

23.     In *Revco D.S., Inc. (Morgenstern v. Revco D.S., Inc.)*, 898 F. 2d 498, 501 (6th Cir. 1990), the Sixth Circuit held that "(u)nless § 1104(b)(2) [the former codification of §1104(c)(2) requires the appointment of an examiner in [a case where the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000] , it becomes indistinguishable from § 1104(b)(1) [the former codification of § 1104(c)(1)]. Again construing the statute *in para materia*, as we must, ..., we find that the appointment of an examiner is mandatory under § 1104(b)(2)."

24.     In view of the circumstances presented in this case, the Court must not permit this Debtor to continue operating as a debtor in possession. Although the United States Trustee contends that the appointment of a chapter 11 trustee is the best remedy to address Debtor's misdeeds, the appointment of an examiner is also an appropriate resolution for the same reasons. Consequently, in the event the Court does not order the United States Trustee to appoint a chapter 11 trustee, the Court should enter an order directing the appointment of an examiner in this case.

## CONCLUSION

Section 1104(a) of the Code does not attempt to give an all-inclusive definition of what constitutes cause for the appointment of a chapter 11 trustee. Rather, the Code recognizes that what constitutes sufficient cause for the appointment of a chapter 11 trustee in a particular case is a question of fact. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3rd Cir. 1989), *7 Collier on*

8

*Bankruptcy* ¶ 1104.02[3][a] (15th Ed. Rev.). Once a court determines that the facts as presented establish cause, the statute mandates that the court "shall" appoint a trustee. *In re Oklahoma Refining Company,* 838 F.2d 1133, 1136 (10th Cir. 1988). *See Escoe v. Zerbst*, 295 U.S. 490, 493 (1935)("shall" is the language of command; its use in a statute indicates intent that the statute should be mandatory). Cause exists for the appointment of a chapter 11 trustee in this case for the reasons stated in this motion. The Court should therefore enter an order directing the United States Trustee to immediately appoint a trustee. Alternatively, this Court should order the appointment of an examiner.

Wherefore, the United States Trustee prays that the Court enter an order directing the appointment of a chapter 11 trustee or alternatively directing the appointment of an examiner in this case, and granting such other and additional relief as the Court deems appropriate.

Respectfully submitted,

**DANIEL M. McDERMOTT**
**UNITED STATES TRUSTEE**
Region 9


By: /s/ David K. Foust (P23450)
David.K.Foust@usdoj.gov
Trial Attorney
Office of the U.S. Trustee
211 West Fort St - Suite 700
Detroit, Michigan 48226
313-226-7954

Dated: July 2, 2010

9

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:                                      Case No. 10-53029-SWR

**DOUBLE G RANCH, LLC,**                    Chapter 11

      Debtor.                             HON. STEVEN W. RHODES
_____/

## <u>ORDER DIRECTING APPOINTMENT OF CHAPTER 11 TRUSTEE</u>

**THIS MATTER** came before the Court on the United States Trustee's Motion for Appointment of Chapter 11 Trustee or for Appointment of Examiner pursuant to 11 U.S.C. § 1104.

The Court, having considered the pleadings filed herein, and the Court being otherwise fully advised in the premises:

**NOW, THEREFORE;**

**IT IS ORDERED** that the United States Trustee, after consultation with parties in interest, shall appoint a Trustee in this case pursuant to 11 U.S.C. § 1104(d);

**IT IS FURTHER ORDERED** that any authority granted to Debtor, Double G Ranch, LLC, under the United States Bankruptcy Code as Debtor-in-Possession is terminated; and

**IT IS FURTHER ORDERED** that the Trustee shall comply with the provisions of 11 U.S.C. § 1106.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:                                          Case No. 10-53029-SWR

**DOUBLE G RANCH, LLC,**                        Chapter 11

     Debtor.                             HON. STEVEN W. RHODES

_____/

## NOTICE OF MOTION FOR APPOINTMENT OF
## CHAPTER 11 TRUSTEE OR FOR APPOINTMENT OF EXAMINER

     The United States Trustee, has filed papers with the court to appoint a trustee or to appoint an examiner.

     **Your rights may be affected.**  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you not have an attorney, you may wish to consult one.)

     If you do not want the court to appoint a trustee or convert the case, or if you want the court to consider your views on the motion, **within 14 days**, you or your attorney must:

     1.     File with the court a written response or an answer, explaining your position at:[1]

U.S. Bankruptcy Court
211 West Fort Street
Detroit, MI 48226

     If you mail your response to the court for filing, you must   mail it early enough so the court will receive it on or before the date stated above.

     You must also mail a copy to:     David K. Foust, Esq.
Office of the United States Trustee
211 West Fort Street, Suite 700
Detroit, MI 48226

     2.     If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

     If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.

     **DANIEL M. McDERMOTT**
     **UNITED STATES TRUSTEE**
     Region 9

     By:     /s/ David K. Foust (P23450)
     David.K.Foust@usdoj.gov
     Trial Attorney
     Office of the U.S. Trustee
     211 West Fort St - Suite 700
     Detroit, Michigan 48226
     313-226-7954

Dated: July 2, 2010

---

[1] Response or answer must comply with F.R. Civ. P. 8(b), (c) and (e)

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:                                          Case No. 10-53029-SWR

**DOUBLE G RANCH, LLC,**                        Chapter 11

        Debtor.                                 HON. STEVEN W. RHODES
_____/


## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on July 2, 2010, I served copies as follows:

1.      Documents Served:          *Motion for Appointment of Chapter 11 Trustee or for*
                                   *Appointment of Examiner, Notice of Motion* and
                                   *Certificate of Service.*

2.      Served Upon:               Double G Ranch, LLC
                                   8955 E. Pinnacle Peak Road
                                   Suite 99
                                   Scottsdale, AZ 85255

3.      Method of Service:         First Class Mail


                                   **DANIEL M. McDERMOTT**
                                   **UNITED STATES TRUSTEE**
                                   Region 9


                        By:    <u>/s/ Karen Riggs</u>
                               Karen.Riggs@usdoj.gov
                               Paralegal Specialist
                               Office of the U.S. Trustee
                               211 West Fort Street - Suite 700
                               Detroit, Michigan 48226
                               313-226-7259

Date:  July 2, 2010

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In Re:                                          Case No. 10-53029-SWR

**DOUBLE G RANCH, LLC,**                         Chapter 11

        Debtor.                                 HON. STEVEN W. RHODES
_____/


## EXHIBIT LIST

Exhibit A       Transcript of Mr. Graves' June 15, 2010 section 341 meeting

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the matter of:

PETER J. GRAVES,                Case No. 10-53046

                                Detroit, Michigan
                                Tuesday, June 15, 2010
                                Judge Rhodes

            Debtor
_____/

                341 HEARING - ERRATA SHEET

    BEFORE DAVID FOUST, OFFICE OF THE UNITED STATES TRUSTEE

        TRANSCRIPT ORDERED BY:  DAVID FOUST (Office of the
                    United States Trustee)

An error was made in speaker identification.

Page 22, line 11, through page 27, line 2, the questioner is
Stephen Wagner, not Daniel Finwall.

Page 52, line 16, through page 60, line 6, the questioner is
Stephen Wagner, not Daniel Finwall.


Transcribed by:         _____
                        Lynn L. Simmons
                        8284 Caribou Trail
                        Clarkston, MI  48348
                        248-922-1587

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In the matter of:

PETER J. GRAVES,                    Case No. 10-53046

                                    Detroit, Michigan
                                    Tuesday, June 15, 2010
                                    Judge Rhodes

          Debtor
_____/

                        <u>341 HEARING</u>

   BEFORE DAVID FOUST, OFFICE OF THE UNITED STATES TRUSTEE

      TRANSCRIPT ORDERED BY:  DAVID FOUST (Office of the
                    United States Trustee)

APPEARANCES:

For the Debtor:               Sheldon Toll, P.L.L.C.
                              BY:  SHELDON TOLL
                              2000 Town Center, Suite 2100
                              Southfield, MI  48075

For Mark and Donald           BY:  DANIEL FINWALL
Dardzinski:                   23906 Woodward, Suite 200
                              Pleasant Ridge, MI  48069

For the U.S. Trustee:         Office of the U.S. Trustee
                              BY:  DAVID FOUST
                              211 W. Fort St., Suite 700
                              Detroit, MI  48226

Also present:                 Chuck Hitt, in pro per
                              Mary Jo Joseph, in pro per
                              Stephen Wagner, Office of the
                                 U.S. Trustee, analyst

Transcribed by:               Lynn L. Simmons
                              8284 Caribou Trail
                              Clarkston, MI  48348
                              248-922-1587

**EXHIBIT A**

## TABLE OF CONTENTS

PROCEEDINGS - Tuesday, June 15, 2010                    3

DEBTOR WITNESS:  **Peter J. Graves**

Appearances by participants                    3
Examination by Mr. Toll                        5
Examination by Mr. Foust                       5
Examination by Mr. Finwall                     22
Examination by Mr. Foust                       27
Examination by Mr. Finwall                     29
Examination by Mr. Hitt                        38
Examination by Ms. Joseph                      48
Examination by Mr. Finwall                     52
Examination by Mr. Foust                       60

2

**EXHIBIT A**

1                     Detroit, Michigan

2                     Tuesday, June 15, 2010

3                     3:00 P.M. Call

4                     _ _ _

5       MR. FOUST:  Good afternoon.  This is the time and

6  place set for a meeting -- for the meeting of creditors

7  required by Section 341(a) of the Bankruptcy Code in the

8  matter of Peter J. Graves, Chapter 11 case number 10-53046-

9  SWR, Eastern District of Michigan.  It's presently 3:02 P.M.,

10  and today's date is June 15th, 2010.

11       My name is David Foust.  I'm an attorney with the

12  Office of the United States Trustee, which is a part of the

13  United States Department of Justice.  With me is Stephen

14  Wagner, who is an analyst with the Office of the United States

15  Trustee.

16       This meeting provides an opportunity for creditors

17  and other parties in interest, including the U.S. Trustee, to

18  ask questions of the Debtor.

19       Before proceeding any further, I would like counsel

20  for the Debtor and all creditors or other interested parties

21  who intend to ask questions to put their appearances on the

22  record.

23       MR. TOLL:  For the record, Mr. Foust, my name is

24  Sheldon Toll, and I'm the attorney for the Debtor.

25       MR. FOUST:  Thank you, sir.

3

**EXHIBIT A**

1    MR. FINWALL:  Daniel Finwall on behalf of creditor
2 Donald Dardzinski.
3         MR. FOUST:  And your last name is spelled how, sir?
4         MR. FINWALL:  Finwall, F as in Frank, i-n-w-a-l-l.
5         MR. FOUST:  Thank you.  Any other individuals who
6 intend to ask questions?  Okay.
7         These proceedings are being recorded --
8         MR. HITT:  Chuck Hitt.
9         MR. FOUST:  Mr. Hitt?
10        MR. HITT:  Yeah.
11        MR. FOUST:  On behalf of yourself I assume, sir?
12        MR. HITT:  Yes.
13        MS. JOSEPH:  And Mary Jo Joseph.
14        MR. FOUST:  Mary -- I'm sorry?
15        MS. JOSEPH:  Mary Jo, J-o --
16        MR. FOUST:  Uh-huh.
17        MS. JOSEPH:  -- last name Joseph, J-o-s-e-p-h.
18        MR. FOUST:  On your own behalf I take it?
19        MS. JOSEPH:  Yes.
20        MR. FOUST:  Okay.  Anybody else?
21        MR. SOLESTI:  I'm Jeff Solesti (ph. sp.).
22        MR. FOUST:  I'm sorry, sir?
23        MR. SOLESTI:  Jeff Solesti.
24        MR. FOUST:  Do you intend to ask any questions of --
25        MR. SOLESTI:  (No audible response.)

4

EXHIBIT A

1       MR. FOUST:  Okay.  These proceedings are being

2    recorded.  It's important that all the questions and responses

3    be stated clearly.

4       Mr. Graves, would you please stand and raise your

5    right arm.

6              PETER J. GRAVES, DEBTOR, SWORN

7       MR. FOUST:  Thank you.  Mr. Toll, please proceed

8    with your examination of Mr. Graves.

9                     **EXAMINATION**

10   BY MR. TOLL:

11   Q.   Mr. Graves, are you the Debtor on this case?

12   A.   Yes, I am.

13   Q.   Are you familiar with the statement of financial affairs

14   and the schedules that were filed in this case?

15   A.   Yes, I am.

16   Q.   Did you prepare them?

17   A.   Yes, I did.

18   Q.   Did you review them before they were filed?

19   A.   Yes, I did.

20   Q.   Did you sign the oath that they were true and accurate?

21   A.   Yes, I did.

22       MR. TOLL:  I have no further questions.

23                     **EXAMINATION**

24   BY MR. FOUST:

25   Q.   Okay.  I take it, Mr. Graves, you met with Mr. Toll prior

5

**EXHIBIT A**

1  to the preparation of the schedules?

2  A.    Yes.

3  Q.    And you jointly prepared them?

4  A.    Right.

5  Q.    Okay.  And did you sign the petition?

6  A.    Yes, I did.

7  Q.    Did you sign the declaration concerning the Debtor's

8  schedules?

9  A.    Yes.

10  Q.    And did you sign the statement of financial affairs?

11  A.    Yes, I did.

12  Q.    Okay.  To the best of your knowledge are the statement --

13  do -- are the statement of financial affairs and the schedules

14  as amended accurate today?

15  A.    Yes, they are.

16  Q.    Okay.  For the record, Mr. Graves, would you please

17  explain your relationship to Double G Ranch, L.L.C.?

18  A.    Yes.  I'm one of the founding members, and actually my

19  role is -- as a -- as a -- as president and treasurer of the

20  company.  And I founded it with two other partners:  Lawrence

21  Grinnell and Tim McKay.

22  Q.    And you're one of the managing partners?

23  A.    Yes, I am.

24  Q.    The other one is?

25  A.    Lawrence Grinnell.

6

**EXHIBIT A**

1  Q.   Okay.  And what was your -- or what is -- what was, what

2  is your duties with regard to Double G?

3  A.   My -- my primary duty was to -- was to -- was to raise

4  money for both the company and all of our long-term real

5  estate projects for equity investors, and to handle all of the

6  investor relations associated with -- with all of that

7  borrowing, and -- and also -- well, manage the partnership

8  along with -- with Lawrence on all -- all important decisions

9  that were made by the company.

10  Q.   Okay.  And how did you go about raising money, sir?

11  A.   How did I go about raising money?

12  Q.   Yes.

13  A.   Well, I've been an entrepreneur for a long time, and have

14  -- have had a lot of very successful businesses in the past

15  and have raised money from a lot of these investors for many,

16  many years, and when I retired from Chrysler, I diversified

17  myself of all those businesses, and -- but at the same time we

18  had started this company.  And so I went back to friends,

19  family, colleagues that knew me for many years and so forth

20  and knew what I was doing, and -- and offered them the chance

21  to either be a -- a lender to Double G Ranch or a long-term

22  investor in any of our projects.

23  Q.   Okay.  And did -- I believe it was your testimony at the

24  341 meeting held for Double G that some people chose to

25  directly invest with you rather than with Double G or any of

7

1  Double G's --

2  A.    Absolutely.

3  Q.    -- projects.  If you could explain a little.

4  A.    Sure.  Sure.

5  Q.    Strictly for the record here.

6  A.    Okay.  For -- well, when we started up Double G Ranch,

7  Double G Ranch was a basically start-up company.  Lawrence and

8  I were not experienced real estate developers, but we had the

9  idea to -- to capitalize and take advantage of the market in

10 -- in the Arizona and the Phoenix valley, and all -- all the

11 -- all my previous lenders and investors and so forth knew me

12 very well, but they didn't know a start-up company, and -- and

13 so they were -- they were extremely at ease of lending me

14 money personally as opposed to a company that they, you know,

15 knew nothing about.  They didn't know Lawrence, my partner, at

16 all, or Tim McKay, who was the -- was basically -- he -- he's

17 a -- almost a silent partner, but at the same time he was --

18 his role was to raise a lot of money also.

19 Q.    Okay.

20 A.    So for many years people loaned me money as opposed to

21 the company.

22 Q.    With the expectation that you would do what with the

23 money?

24 A.    Put it into the company as -- as -- to -- I mean they

25 loaned me money so I could -- I could loan it into the company

8

**EXHIBIT A**

1  and grow the company and acquire all the assets and do

2  everything as far as the entire development process that --

3  that our company was designed and -- and we actually set out

4  to do.

5  Q.   I see.  Mr. Graves, I'm showing you a copy of your

6  Schedule A, dealing with real estate.

7  A.   Okay.

8  Q.   The only real estate listed on Schedule A are two time

9  share units that you own in Hawaii; is that correct?

10  A.   That's right.

11  Q.   Okay.  Do you have any ownership interest in what is

12  listed as your residence in East Jordan, Michigan?

13  A.   No, I don't.  I'm -- I'm on the mortgages as a -- as

14  liable for the mortgage, but I've never been on the title at

15  all.

16  Q.   The property is owned by your wife; is that --

17  A.   Yes.

18  Q.   Okay.

19  A.   We've been married for 24 years, and it's -- it's a

20  second marriage, and she's always kept her assets separate

21  from mine.

22  Q.   But you're on the mortgage, eh?

23  A.   Yes.

24  Q.   You had a home in Arizona at one time, didn't you, sir?

25  A.   Yes, we did.

9

**EXHIBIT A**

1  Q.   And was that home owned by you and your wife?

2  A.   No -- well, originally it was only owned by my wife, but

3  back in May of '99 we had to take a hard money loan from hard

4  money lenders, and so at that time they required me to be put

5  on the title of the property also.

6  Q.   I see.  You no longer own it though I take it.

7  A.   No.  We sold it in March of this year.

8  Q.   I didn't see it listed on the statement of financial

9  affairs as property that was -- that you -- oh, here it is,

10 right in front of me.  Was that just an oversight?

11 A.   Probably so, yeah.

12          MR. FOUST:  It's -- maybe I should ask Mr. Toll.

13 Question 10 asks for transfers made within I think it's a two-

14 year period.

15      (Discussion off the record.)

16          MR. TOLL:  Yeah, that should -- that should have

17 been on there.

18          MR. FOUST:  Okay.

19 BY MR. FOUST:

20 Q.   It was -- it was in May of this year though; right?

21 A.   It was in March.

22 Q.   I'm sorry, March.

23 A.   March of this year.

24 Q.   Okay.

25 A.   I've got the paperwork here.

10

**EXHIBIT A**

1  Q.   And how much did the property sell for, sir?

2  A.   1.225 million.

3  Q.   1.225 million.

4  A.   Correct.

5  Q.   What were the net proceeds, sir?

6  A.   The net proceeds were $713,492.38.

7  Q.   And what were the deductions from the gross amount?

8  A.   The deductions were -- I actually have the closing

9  statement.  There was SOMA charges to seller, 80 -- well,

10  let's see.  There was commission paid to the Realtors of

11  73,500.  Closing costs for the title company of $800.  Owner's

12  coverage of title policy for 3,734.  Some tracking fee for the

13  title company of $75.  Recording of the mortgage deed of $25.

14  Transfer of association fees to Desert Highlands of $400.

15  Monthly dues and charges to Desert Highlands, which was the

16  association that the property was located in, of $2,801.24.

17  And then a home warranty charge of $630.

18  Q.   Was there a mortgage that was paid off?

19  A.   Yes.  Yes.  Yeah.  Oh, yeah.  And then in addition to

20  that there was -- the mortgage was paid off for $428,889.96.

21  And then there was county taxes due of $1,172.16.

22  Q.   Can you provide us with a copy of the closing statements?

23  A.   Yeah, sure.  Sure.

24  Q.   Okay.  What happened to the proceeds, Mr. Graves?

25  A.   The -- the 713?

**EXHIBIT A**

1   Q.   Yes, sir.

2   A.   What we did with it is, my wife and I split it 50-50.

3   Arizona is a community property state, and basically the house

4   had been built by -- by her assets and her loan on our -- on

5   our house up in East Jordan.  So she took half the proceeds

6   for herself and I took half the proceeds.  And -- and what --

7   what I did with my $363,000 is listed in the -- in the

8   schedules there.

9        (Discussion off the record.)

10  BY MR. FOUST:

11  Q.   Okay.  Those are part of the payments made within the 90

12  days of the filing.

13  A.   Yes.

14  Q.   Okay.

15  A.   Yeah, 'cause we -- we closed on March the 16th.

16  Q.   Can you tell me -- let me give you a copy of your

17  statement of financial affairs.  If you could point out which

18  ones --

19  A.   Sure.

20  Q.   -- I would appreciate it.

21  A.   Which ones were --

22  Q.   Part of the 300 and some thousand dollars in proceeds.

23  A.   Yeah.  Let's see here.  I paid -- I paid $100,000 to

24  Morgan Stanley, which was the -- which was part of the secured

25  debt on our East Jordan home.  The reason why we did that is

12

1  because Morgan Stanley -- we have a $700,000 mortgage on our

2  home, and we had a $250,000 home equity loan with Morgan

3  Stanley also.  Morgan Stanley wrote us a letter, not because

4  of any credit reasons or anything, but they said that -- that

5  our line -- our home equity line of credit was being suspended

6  because property values had gone down so much in Michigan, and

7  they couldn't get a true feel on what the appraisal or what

8  our current property would be worth.  So they wanted us to

9  reduce our home equity loan and also suspended the line of

10  credit.

11         So I took 100,000 and reduced the credit line, and

12  my wife took 150 and paid off the rest of the home equity loan

13  from her money.

14  Q.   I see.

15  A.   So that was 100,000 of -- of my money.  102,000 went to

16  Lou Battanti (ph. sp.) and Christine Battanti as repayment of

17  a loan I had with them.  That's right here.  It's really a

18  total of 104,000.

19  Q.   What was that last name?  Battanti?

20  A.   Yeah, Battanti.

21  Q.   Okay.  And that's --

22  A.   And Terry Pruitt I paid $15,000 to.  I paid 57,500 to

23  Robert and Cynthia Wojtkowski, W-o-j-t-k-o-w-s-k-i.  This is a

24  couple who I've really never met but -- but they're in a

25  serious financial situation, and they were about to lose their

13

**EXHIBIT A**

1   home, and I just -- I just had to pay them.

2            Richard Sakora (ph. sp.) is their father.  I paid he

3   and his wife a total of 30,000.  Richard just lost his son to

4   suicide because of their financial problems, situation.  And

5   their other daughter, Deborah Lewandowski (ph. sp.), I paid

6   her $20,000 because they -- this whole family has just been

7   totally devastated.  Those were -- those were the major

8   amounts of money.

9   Q.   Did you ever own any other real estate in Arizona, sir?

10  A.   No.  You mean myself personally?

11  Q.   Yes.

12  A.   No.

13  Q.   Mr. Graves, I'm handing you copies of claims that have

14  been filed in your proceeding, two different claims, one filed

15  by Mr. and Mrs. Zilewski (ph. sp.).

16  A.   Right.

17  Q.   Another claim filed by Paul Kolsovicz (ph. sp.) I guess.

18  A.   Kolsovicz.

19  Q.   Kolsovicz.

20  A.   Yeah, Kolsovicz.

21  Q.   There's a letter purportedly from you dated March 2nd of

22  2009 attached to each one of these.

23  A.   Yep.

24  Q.   Is that your signature --

25  A.   Yes, it is.

14

**EXHIBIT A**

1  Q.  -- on the second page of the letter?

2  A.  Yes, it is.

3  Q.  So you did send this letter?

4  A.  Yes, I did.

5  Q.  Okay.  There's a representation in the letter that your

6  Arizona home is free of any mortgage.

7  A.  That's right.  Because this letter was dated March 9th,

8  and we didn't take the mortgage out until May the 27th of '09.

9  Q.  I see.  And --

10  A.  And the reason -- the reason why we took the loan out is

11  because we were down to $58 to our name to live.

12  Q.  May 27th of '09.  Okay.

13  A.  And --

14  Q.  And how much was that mortgage, sir, when you took it

15  out?

16  A.  Yeah.  400,000.

17  Q.  Okay.  Okay.

18  A.  And I actually used half of it to repay people that I

19  owed for loans.

20  Q.  Uh-huh.  Okay.  Now, you remember, Mr. Graves, at your

21  initial interview with the U.S. Trustee you stated that all

22  interest payments that have been made had not been reported to

23  the Internal Revenue Service on forms 1099.  It wasn't clear

24  whether you were referring to interest paid by Double G Ranch,

25  L.L.C., yourself, or both.  At the 341 meeting for Double G,

15

1   you stated that Double G had filed all required forms 1099
2   with the IRS.  So these two statements taken together indicate
3   that you hadn't filed all required 1099 forms with the IRS for
4   interest payments that you made.  Is that correct?
5   A.   That's correct.
6   Q.   And why is that, sir?  Why was that?
7   A.   Well, because, to be frank with you, I -- I've always --
8   I've always understood or thought that you only had to file a
9   1099 if you were going to turn around and claim it as a
10  deduction on your own income tax, and because these were
11  massive amounts of interest that were not related to my
12  personal income tax at all, I didn't think it was right to be
13  charging any and deducting all -- all of the -- all of the
14  business interest basically on my own personal return.
15  Q.   Okay.  It was my understanding, although you said that
16  not all of the 1099s had been filed, but the implication being
17  that some had been filed.  Is that correct?
18  A.   Well, all -- all 1099s for Double G Ranch --
19  Q.   Yeah.
20  A.   -- all interest payments have been made for that.
21  Q.   Okay.  So --
22  A.   In the past over -- over the term of, you know, the last
23  ten or fifteen years, I have had personal loans where I have
24  -- you know, they were a personal loan for me personally on --
25  on our assets and so forth, not business related at all that I

16

1  did 1099 people and -- and -- and I claimed them on my income

2  tax.

3  Q.   Okay.  But the ones you didn't file 1099s on for interest

4  that you paid out, that was for money that you in turn had

5  invested for these people in Double G; is that correct?

6  A.   That's right.  That's right.

7  Q.   Did Double G issue 1099s for any interest that was

8  ultimately paid to them through you?

9  A.   No.

10 Q.   So no 1099s were issued for certain payments of interest

11 --

12 A.   All -- all loans made to me personally, and interest that

13 I paid, I never 1099'd anybody.

14 Q.   Okay.  You were under -- you were under an obligation to

15 do so; correct?

16 A.   I didn't have any understanding one way or the other to

17 be honest with you.  Nobody told me anything.  I mean our CPAs

18 never told us that, my attorney never told me that.

19 Q.   Was this --

20 A.   The subject never even came up.

21 Q.   Well, was this pursuant to an agreement that you had with

22 the lenders?

23 A.   Not at all.  No.

24 Q.   An understanding?

25 A.   Nope.

17

**EXHIBIT A**

1   Q.   At that same initial debtor interview with the U.S.

2   Trustee you also stated that all funds received by you for

3   investment were not always fully invested.  I asked you about

4   this at the Double G Ranch 341 meeting, and I'm handing you a

5   copy of the transcript of that meeting.

6   A.   Okay.

7   Q.   If you could turn to page 29, I'd appreciate it.

8   A.   All right.

9   Q.   At line 11 I asked you:

10       Q.   "What happened with regard to investments or monies

11       that you received for investment?  What did you do with

12       those monies?  These are funds you received personally I

13       take it."

14  You responded:

15       A.   "Right.  Right.  People would loan me money

16       personally.  For -- for example, if somebody loaned me

17       $50,000, I -- I might take 30,000 of it and put it into

18       Double G Ranch.  The other 20,000 I might turn around and

19       pay interest payments on behalf of Double G Ranch or my

20       loan ledger with -- with those people."

21  A.   Right.

22  Q.   Is that correct?

23  A.   Yes.  Can I -- can I further explain just a little?

24  Q.   Well, I just wanted --

25  A.   Okay.

18

**EXHIBIT A**

1   Q.   -- is that still your testimony?

2   A.   Yes.

3   Q.   Okay.  Is there something further you wanted to add to it

4   though?

5   A.   No, I guess not.

6   Q.   Okay.  Could you also turn to the bottom of page 20 of

7   the Double G -- Double G Ranch 341 meeting transcript.

8   A.   Page 20?

9   Q.   Yes, sir.

10  A.   Okay.

11  Q.   Mr. Norris, Matthew Norris, an attorney that was present

12  at the Double G Ranch 341 meeting --

13  A.   Uh-huh.

14  Q.   -- asked you a question; at line 23 he asked:

15       Q.   "I understand you're owed about $690,000 from Double

16       G; is that right?"

17  And you answered:

18       A.   "That's one number.  And -- and we have a huge

19       number that's undetermined at this point in time."

20       Q.   "What would the huge number be comprised of?"

21  You answered:

22       A.   "It would be comprised of personal loans that --

23       that people have loaned me, and then I have loaned the

24       company, and in addition to all the carrying costs over

25       the years of -- of financial representatives, commissions

19

1       that were paid, [and the differences] and the difference

2       between interest owed to me and the interest that I paid

3       to individuals."

4           Q.   "Is it all memorialized somewhere?"

5   You answered:

6           A.   "No, it's not."

7   Can you expand on your final answer that the liability due you

8   from Double G is not memorialized anywhere?

9   A.   It's not.

10  Q.   I mean --

11  A.   It's --

12  Q.   I'm sorry.

13  A.   I'm sorry.

14  Q.   Go right ahead, sir.

15  A.   By memorialize what do you mean?

16  Q.   Well, I assume -- are there records that support this

17  (indiscernible)?

18  A.   (Interrupting.)  Oh, absolutely, absolutely.

19  Q.   Well, what did you take it to mean when you answered that

20  it wasn't memorialized?

21  A.   Did they ask me that it wasn't memorialized?

22  Q.   Yeah, that -- his -- Mr. Norris's final question is --

23  was, "Is it all memorialized somewhere?"  You answered, "No,

24  it is not."

25  A.   Maybe I didn't understand what memorialized meant because

20

1  we've always had complete -- complete detailed accounting

2  records of everything.

3  Q.   Have you provided those to Mr. Wagner?

4  A.   No.

5       (Discussion off the record.)

6       THE WITNESS:  I am -- I am currently in the process

7  of going through and trying to reconcile a number of -- it's

8  going to be in the millions -- of what my carrying costs are

9  for reimbursement from Double G Ranch for all of the loans

10  that I've carried, the difference between the interest that

11  Double G Ranch was paying me and what I was paying people, all

12  the commissions that were paid to the financial representative

13  over the years.  All -- all of that -- all of that number is

14  yet to be determined, and it's going to run into the millions.

15  BY MR. FOUST:

16  Q.   Well, how was that figure arrived at then, the $690,000?

17  A.   Pardon?

18  Q.   How was the figure of 690 --

19  A.   The 690 some thousand dollars only represents what's on

20  the books today as a loan balance that's owed to me.

21  Q.   On Double G's books?

22  A.   That's right.

23  Q.   And I may have asked you this, but I -- when you

24  answered, "No, it's not memorialized," what did you think

25  memorialized meant?

21

 1  A.   I'm not sure, to be honest with you.  Maybe I -- I don't

 2  even remember being asked that question, but --

 3  Q.   Uh-huh.

 4  A.   -- but I have all the records.

 5        MR. FINWALL:  May I ask a question while we're on

 6  the topic?

 7        MR. FOUST:  Sure.  Yes.  I was going to suggest that

 8  you might want to.

 9        THE WITNESS:  And I keep immaculate records.

10                    **EXAMINATION**

11  BY MR. FINWALL:

12  Q.   Well, that's good, because my question would deal with

13  your Schedule F, which is a list of all of your unsecured

14  creditors.  I counted somewhere in the neighborhood of 55

15  unsecured creditors, individual creditors.

16  A.   Okay.

17  Q.   With a total dollar amount owed of somewhere around --

18  A.   Seven million.

19  Q.   -- 7.361.

20  A.   Right.  Right.

21  Q.   Now, from a very simple accounting journal entry, if

22  you're going to borrow money, or if you borrowed money and

23  received $7.3 million, you would have a corresponding asset on

24  a balance sheet.  If you're going to somebody the money, you

25  received the money.

                              22

1    A.    Right.

2    Q.    Correct?

3    A.    Right.

4    Q.    We -- on your Schedule B I believe you -- you leave open

5    that amount that -- that undetermined amount --

6    A.    That's right.

7    Q.    -- invested into Double G, or owed from Double G.

8    A.    That's right.  That's right.

9    Q.    But on Double G's books they don't show an investment

10   from Peter Graves of $7.3 million.

11   A.    No, they don't.

12   Q.    How do you account for that?

13   A.    What -- well, what I did from day one is, I invested

14   myself about 500,000 to 700,000 of my own money originally in

15   the company, and then as people were loaning me money, I had a

16   checking account named Peter Graves, we had a Double G Ranch

17   checking account that was specifically for me to handle and

18   control.  Now, there were other checking accounts in Arizona,

19   but we had a Michigan account here.

20   Q.    Okay.  That -- can I ask a clarification.  So these

21   checking accounts were Double G checking accounts or Peter

22   Graves?

23   A.    One -- one was Double G, one was Peter Graves.  So all

24   the money that came into Peter Graves' account, okay, has

25   always been accounted for, and it will -- got moved over to

23

**EXHIBIT A**

1  Double G Ranch.  Not all of it, but some of it.

2  Q.  Of the 7.3 million, approximately how much?

3  A.  No, no, because it's too -- it's too complex that way.

4  Q.  But --

5  A.  For -- for example, if somebody were to give me $100,000

6  --

7  Q.  Right.

8  A.  -- they would pay -- they would send me -- give me a

9  check for Peter Graves for 100,000.  I would turn around and

10  put it in that account.  I would write a check from Peter

11  Graves and deposit it in the Double G Ranch account for

12  100,000.  And then it would be on the books as my loan to

13  Double G Ranch for 100,000.

14  Q.  And on Double G's books what would it -- how would it

15  appear?

16  A.  It would appear as a notes payable to me for 100,000.  So

17  the company owed me because I was loaning the company that

18  100,000.

19  Q.  Okay.

20  A.  So all --

21  Q.  Double G's schedule lists an amount owed to you of 600

22  and some thousand dollars.

23  A.  That's right.  That's my current balance now.  Because

24  for the last ten years I've had a floating balance up and

25  down, every year.

24

**EXHIBIT A**

1  Q.    Can we --

2  A.    My money is put in and taken out.

3  Q.    Will it be possible to reconcile the 690,000 with the 7.3

4  million?

5  A.    No.  No, I don't think it would be, no.  There's too many

6  in-and-out entries.  I mean -- each year.  For example, as

7  I've stated before, as -- as these loans came in and I moved

8  money over to Double G Ranch when interest payments were made

9  and so forth, if there wasn't money in the Double G Ranch

10 account but there was in Peter Graves account, I would turn

11 around and pay the interest to these people out of the Peter

12 Graves account; it never hit the Double G Ranch books.  That's

13 just one example of many.

14 Q.    Were you the only person that had check writing authority

15 for Double G?

16 A.    No.  Well, the Michigan account had Lawrence and I as

17 signatures, but I -- I was the only one that ever signed any

18 checks on the Michigan account.  The Arizona accounts that we

19 had were -- we -- we always had both signing power, but I

20 never signed anything in the Arizona accounts.  So the

21 Michigan account was strictly to handle money coming in and

22 going out for just interest payments, loans, and so forth like

23 that, where -- where all of the other money that went to

24 Arizona was for all the other operations of the business.

25         For -- again, for an example, if -- if -- if

25

1  currently today I had a $2 million loan balance on the books

2  of Double G, somebody gave me $100,000.  I might only take

3  50,000 of it and put it into Double G Ranch, because I

4  currently owe either -- either principal or interest payments

5  from -- in my name to -- to people.  So rather than turn

6  around and put it into Double G Ranch and then turn around and

7  -- and pay it right back to myself again, I would leave that

8  money in my account and then just pay out the principal and

9  any interest from the Peter Graves account.  So of the 100,000

10 that was loaned to me, 50,000 only went over and hit my books

11 on Double G, but I have a debt over here of $100,000.

12 Q.   So people, individuals, invested money with you, and

13 there was never an implied or explicit statement that they --

14 the money that they were giving you was going to be invested

15 into Double G?

16 A.   Oh, I'm sure, I'm sure everybody assumed that.  I never

17 -- I never stated that, but I even assumed that they had

18 assumed it, and that's what I -- that's what I've always used

19 the money for.  All of the money that has been loaned to

20 either me or Double G Ranch has always gone to the acquisition

21 of assets, of the development of properties and -- and all the

22 operational expense in conjunction with operating the

23 business, whether it's been in my name or -- or --

24 Q.   Even if that is paying interest on notes issued by Peter

25 Graves?

26

1  A.    That's right.  That's right.

2  Q.    An individual.

3  A.    That's right.  All -- all of the money has been used for

4  that purpose.

5          MR. FOUST:  Are you finished?

6          MR. FINWALL:  For the time being, yeah.

7          MR. FOUST:  Okay.

8                    **EXAMINATION**

9  BY MR. FOUST:

10 Q.    Would you turn to page 14 of the transcript, sir.

11 There's a discussion beginning at line 7 about the foreclosure

12 of Double G Desert Village.

13 A.    Right.

14 Q.    Do you have any idea what the sales price was, the

15 foreclosure?  If you know.

16 A.    I -- I don't know, but it was right at a million dollars.

17 Q.    Approximately a million dollars.

18 A.    But it was right at a million dollars.  And that -- you

19 know, we can always find that out.  And I believe the bank was

20 owed $1,181,000.  So they did take a loss, too.

21 Q.    How much had Double G put into the project?  Do you have

22 any idea?

23 A.    No.  We -- we initially put in 300,000, and then we put

24 in another 15,000 or 20,000 as a limited partner.  So we owned

25 38 percent of the project as our company.  And then, because

27

1  we lost our anchor tenant, which was U.S. Bancorp, we started
2  -- we started making the mortgage payment on behalf of the
3  partnership -- we didn't have to but we did -- for a long
4  time.  And I think our balance of the loan that we had loaned
5  the project was up in the area of between 650,000 and 700,000.
6  So we lost that, too.
7  Q.   That's on top of the 300 to 400.
8  A.   Right.  Plus, plus we lost 38 percent of a wonderful
9  project, too, that was paying well up until that time.
10 Q.   Mr. Graves, I'm showing you copies of your Schedules I
11 and J.
12 A.   Okay.
13 Q.   You know, I is your income --
14 A.   Right.
15 Q.   -- J is your expenses.  J shows a monthly deficit of --
16 on the next page there -- of $2,333.61.  Is that accurate?
17 A.   Yes, it is.
18 Q.   Okay.  How do you make ends meet every month?
19 A.   Well, right -- right now we're living off the money that
20 my wife still has from the sale of the home.
21 Q.   Oh.  Okay.  Your wife's savings in other words; right?
22 A.   (No audible response.)
23 Q.   Okay.
24       MR. FOUST:  I have no further questions at this
25 time.  Mr. Finwall, did you have any questions?

28

**EXHIBIT A**

1                         **EXAMINATION**

2    BY MR. FINWALL:

3    Q.   I'm still a bit confused, sir, about what you -- the

4    Justice Department attorney --

5            MR. FOUST:  Do you want to put your appearance on

6    the record?

7            MR. FINWALL:  Sure.  Dan Finwall on behalf of debtor

8    Donald Dardzinski.

9    BY MR. FINWALL:

10   Q.   About the -- I'd like to touch on the -- you said you had

11   two separate accounts.

12   A.   Right.

13   Q.   You had a Double G account and you had a Peter Graves

14   account; is that correct, sir?

15   A.   Right.

16   Q.   And if someone gave you $100,000, you testified, you may

17   use $50,000 to give to Double G Ranch, but the other 50,000

18   may go out to pay interest payments?

19   A.   Or principal back, back to previous lenders, right.

20   Because I had a floating balance all the time with these

21   people.

22   Q.   But the people -- the person who gave you the $100,000,

23   would it be safe to say that they were under the impression

24   that money was to be used for Double G Ranch?  You testified

25   that that money was to be used for Double G Ranch.

                                29

1  A.    It was.

2  Q.    But not if you're paying interest payments, sir.  I'm not

3  going to argue; I'm going to ask questions.  But you just said

4  that you may use half of that money to make interest payments,

5  and not invest in Double G Ranch; is that safe to say?

6  A.    Well, what -- what I'm trying to say is all interest

7  payments made to these people were -- were from loans that

8  were made to myself and/or Double G Ranch.  So if people

9  loaned me money previously that -- that was put into the

10 company and so forth, the interest payments on those were made

11 back to them on behalf of the company.

12 Q.    But you --

13 A.    I just happened to be making the payment.

14 Q.    But you -- you did testify that it was a safe assumption

15 that people thought that money was going to Double G Ranch; is

16 that safe to say?  That they thought the money was going to

17 Double G, not Peter Graves to pay interest payments?

18 A.    Well, they thought -- yeah, they thought the money was

19 going to me in order for me to put it into the company to pay

20 all of the -- all of the expenses and carrying costs of the

21 operation of the business.

22 Q.    So they weren't sure where the money was going, but they

23 thought it was going to Double G Ranch; is that safe to say?

24 A.    Yes.

25 Q.    Okay.  And I just had some questions about the sale of

30

1  the property in Scotsdale, Arizona.

2  A.    Uh-huh.

3  Q.    I believe it was on Happy Valley Road?

4  A.    Right.

5  Q.    Who held the note on that mortgage?  Was that from a bank

6  or an individual?

7  A.    No, it was -- we -- we went to a finance company of some

8  kind.  It was GMAC Finance in Scotsdale who put together four

9  or five private individuals that loan money on a hard money

10 basis.

11 Q.    Did you know those individuals prior to speaking with

12 Household Finance?

13 A.    No, I didn't.

14 Q.    So Household Finance --

15 A.    It was Household Finance.

16 Q.    So what you're testifying is that Household Finance found

17 five investors to help, or to finance this mortgage?

18 A.    I guess how the -- that's how they do it, yeah.

19 Q.    Had the Happy Valley property been in -- how many times

20 has that been transferred in the last five years between you

21 and your wife; more than once?

22 A.    No.  It was never transferred up until the time we took

23 the mortgage.  It was always in her name.

24 Q.    It was always in her name, and then when you took the

25 mortgage, you put your name on the deed in order --

31

1  A.   Because I had to.  They -- they required me to do that.

2  Q.   And that's the only time that property was transferred?

3  A.   That's right.

4  Q.   I think the Trustee's Office and Justice Department has

5  touched on Pine Lake Road in East Jordan.  Why were -- I mean

6  you testified that certain individuals were given preference

7  over other people you owed money to because they were under

8  hard times.  There was suicide, there was hard times.  Given

9  -- did it ever cross your mind to spread that out evenly

10 instead of just picking randomly three or four creditors?

11 A.   No, because I -- I was basically advised not to pay

12 anybody, because that's the problem I would have with -- with

13 -- people would question why I paid one person versus another.

14 Q.   Well, let me expand on that.  Who advised you to that?

15 A.   You mean not to --

16 Q.   Who advised you not to make any payments whatsoever?

17         MR. TOLL:  It was -- it was legal advice.  I think

18 you shouldn't testify to that.

19 BY MR. FINWALL:

20 Q.   And when was the first time you spoke with an attorney

21 concerning bankruptcy, sir?

22 A.   It was March, wasn't it, of this year?

23 Q.   About the same time you sold the house in Scotsdale?

24 A.   Well, we -- I -- I first contacted Sheldon back in the

25 fall because of the -- you know, because of my debts situation

32

1    and everything, and we -- we were trying to work out a plan

2    between Double G Ranch and myself personally to -- to be able

3    to work all this out to where our assets could be liquidated

4    and sold in such a way that Double G Ranch's debt could be

5    extinguished and so could mine.  And -- and I had contacted

6    him in order to write a letter and -- and put out some

7    information to people, and even just a question of what --

8    what I should be doing in the future.  But we -- we didn't

9    touch base most of all -- all the winter until we -- until we

10   came back here.  And then because of Double G Ranch's and

11   because of the pending lawsuits that were coming against

12   Double G Ranch and myself is when we got forced into

13   bankruptcy.

14   Q.   So what is your answer?  You first consulted a bankruptcy

15   attorney in March?  Or was it last fall?

16   A.   I first consulted Sheldon in the fall, but it wasn't

17   necessarily to file bankruptcy.

18   Q.   I notice on your Schedule B that you list a Rolex watch

19   and some other -- I'm going to change gear a little bit -- and

20   some other articles of jewelry, but the value is only $1,000.

21   Can you explain that?  Were those appraised?  Let me ask you

22   that.  Were those appraised?

23   A.   No, they were not appraised.  They're just an estimate I

24   put together based upon what you -- what I thought they could

25   -- they could be sold for today.

33

**EXHIBIT A**

1  Q.   And -- and artwork at $500.  Is -- is that a safe

2  estimate of all the artwork you possess, sir?  $500 or is it

3  more?

4  A.   The way artwork is going today, I would think that would

5  be a decent appraisal, because we recently sold artwork in

6  Arizona and didn't get anything for it.

7  Q.   How long ago did you sell artwork in Arizona.

8  A.   How long ago?

9  Q.   Uh-huh.

10 A.   We sold it with the house.

11 Q.   Oh, so the artwork went with the house.

12 A.   That's right.  All the furnishings went with the house.

13 Q.   I see.  Okay.

14 A.   So we lost a lot of money.

15 Q.   And the -- the boat that you listed, $29,000 --

16 A.   Uh-huh.

17 Q.   -- does the boat have a secured lien on it, or is that

18 paid for?

19 A.   No, that's paid for.

20 Q.   And what about any -- any large gifts to your wife in the

21 past year, sir?

22 A.   No.

23 Q.   In the past five years?

24 A.   What do you mean by large?

25 Q.   Over $1,000, how's that?

**EXHIBIT A**

1   A.   In the last five years?

2   Q.   Uh-huh.

3   A.   I can't recall any big item over $1,000.

4   Q.   Did you ever have an interest or loan any money

5   concerning a property at 76750 Oak Hill Road in Clarkston?

6   A.   Yes.

7   Q.   Did you -- did you have an ownership interest in that

8   property?

9   A.   Yeah, for a long, long time, for 20 some years.

10  Q.   When did you sell that property, sir?

11  A.   I don't -- I can't tell you a date.

12  Q.   Who owns that house now?

13  A.   My ex-wife.

14  Q.   Your ex-wife owns it?  Was that part of a divorce?  Was

15  that given to her as part of the divorce?

16  A.   No.  No.  We -- well, we've been divorce over 25 years.

17  But our divorce settlement allowed her to stay in the house

18  until the kids were 20 years old or whatever, and I had to

19  make half the mortgage payments, which we did.  And then --

20  it's been --

21  Q.   It's been over five years?

22  A.   Oh, yeah.  Oh, yeah.

23  Q.   Okay.  What about --

24  A.   At least, yeah.

25  Q.   What about a house at 5010 Kahahilo Road (ph. sp.) in

35

**EXHIBIT A**

1  Kealia, Hawaii -- or Lahaina, Hawaii?

2  A.   Well, that's -- that's our Marriott time share.  We have

3  two time shares in Marriott.

4  Q.   At 5010 Kahahilo Road?

5  A.   I can't tell you the address.

6  Q.   We -- we found an Internet appraisal of approximately

7  $2.1 million.  Is that --

8  A.   Oh, no, that's not --

9  Q.   -- is that -- are we looking at something wrong there?

10 You don't own anything that valuable in Hawaii?

11 A.   No.  No.

12 Q.   Does your -- any family members own any property in

13 Hawaii --

14 A.   No.

15 Q.   -- that you know of?

16 A.   No.

17 Q.   What about 3102 Bloomfield Crossing Road in Bloomfield

18 Hills, Michigan?

19 A.   That used to be our home.

20 Q.   How many years ago did you sell that?  More than five?

21 A.   Yes.

22 Q.   Just for brevity sake.  More than five?

23 A.   Yes.

24 Q.   Do you have any interest in any Montessori schools of any

25 kind anymore?

36

**EXHIBIT A**

1  A.   No, not schools, property.

2  Q.   You do have interest in Montessori property still?

3  A.   No, not Montessori property.  Just a private daycare

4  preschool in Madison Heights.  We own some property there

5  under a company called PGL Group.

6  Q.   Is that listed in your schedules, in your statement of

7  financial affairs, sir?

8  A.   It -- it's listed as I'm a 50 percent owner in there, and

9  it's also listed as the asset is yet to be determined.

10  Q.   Do you have any trusts set up for yourself, any living or

11  irrevocable trusts --

12  A.   No, I don't.

13  Q.   -- at all?

14  A.   No.

15  Q.   Or your wife?

16  A.   No.

17  Q.   Any interest in any whole life insurance policies?

18  A.   No.

19  Q.   Any safety deposit boxes?  I know you've answered those

20  questions in your statement of financial affairs.  You do have

21  a safety deposit box?

22  A.   Yes, we have one safe deposit box, right.

23  Q.   And what financial institution is that held at, sir?

24  A.   Sir, Chase, JP Morgan Chase in Boyne City, Michigan.

25  Q.   In Boyne City?

37

**EXHIBIT A**

1   A.    Uh-huh.

2   Q.    Any offshore bank accounts?

3   A.    No.

4   Q.    I -- I noticed also that you listed your clothing at only

5   $200.

6   A.    My clothing?

7   Q.    Your clothing is listed that you own $200 worth of

8   clothing.

9   A.    Well, you can take a whole -- you can take a whole bag of

10   my clothing down -- down and give it away and -- you know,

11   clothing -- used clothing isn't just worth very much.

12   Q.    You're right.

13          MR. FINWALL:  Okay.  I have nothing further.

14          MR. FOUST:  Mr. Hitt, did you have any questions?

15          MR. HITT:  Yes, I do.

16          MR. FOUST:  You want to come up here, sir?  This is

17   all being recorded, so --

18          MR. HITT:  That's fine.

19                   **EXAMINATION**

20   BY MR. HITT:

21   Q.    The gentleman there, some of the questions he asked kind

22   of overlapped what I was going to say, too.  But I mean one --

23   the promissory notes, and I know there's 55 of them or

24   whatever it is, I was with the understanding that when I gave

25   the promissory note, that it went strictly to buy a piece of

**EXHIBIT A**

1  land that you were going to sell, and you were going to give

2  me back my money; correct, Peter?  I mean that's what --

3  that's what the note said.  I mean that's what you said to me

4  on the phone, too.  All of it was going --

5  A.    No.

6  Q.    -- my promissory note for $80,000.

7  A.    Right.

8  Q.    You were going to buy a piece of land in Arizona --

9  A.    I --

10  Q.    -- you had a buyer already --

11  A.    I invested that in -- in three -- three separate

12  properties.

13  Q.    Yeah, but at the time not only was I going to get my

14  money back in 30 days, because you already had a buyer for the

15  property --

16  A.    It didn't work out that way, no.

17  Q.    Obviously, you're right.  That's why I'm here

18  unfortunately.

19  A.    That's right.

20  Q.    That's part of the reason why I'm here.

21  A.    Right.

22  Q.    And then you said also in the note, hey, don't worry

23  about it.  I've got lots of money, number one, you said.  And

24  number two, you said, my house is up for sale, and that's

25  worth well over a million dollars, and with the proceeds from

39

**EXHIBIT A**

1  that house, I will pay your promissory note.  Fine with me.
2  It doesn't make any difference where the money came from.
3  Obviously I didn't get paid.
4          So my question is -- and I understand the plight of
5  some of these people you mentioned in there --
6  A.   Uh-huh.
7  Q.   -- but I didn't get my money, my son-in-law didn't get my
8  money --
9  A.   Right.
10  Q.   --  my sister-in-law didn't get her money --
11  A.   Right.
12  Q.   -- and a lot of these people in this room didn't get
13  money, and I -- I think it's really unfair that you took a
14  friendship and was able to do this.  I mean I wouldn't -- this
15  is a friendship on my part, and I'm sure on a lot of these
16  other people's part, and you talk about financial burdens on
17  everybody.  I mean you're literally taking money from my
18  grandchildren and my children.  And I mean that hurts.  I mean
19  in the long run.
20          Do you have a plan today for what we're -- how we're
21  going to get paid back, if we can get paid back?
22  A.   Well, we're doing our best.  All the assets I plan --
23  have left in the world are what can come from Double G Ranch.
24  Q.   Okay.
25  A.   And if we're successful at saving Double G Ranch and

40

1   liquidating it in such a way, I think we can pay the majority

2   of everybody back.  But that's yet to be determined.

3   Q.   But was it supposed to be a filed plan today or no?

4   A.   No.

5           MR. FOUST:  No.

6   BY MR. HITT:

7   Q.   No?  No, it wasn't?  All right.  My -- I guess my last

8   question there, I heard the figure 7 --

9   A.   What -- what I should say, too, is --

10   Q.   Go ahead.

11   A.   -- my own personal creditors committee here, because --

12   because -- you know, all -- all the people that I owe money

13   personally --

14   Q.   Uh-huh.

15   A.   -- it's all contingent on Double G Ranch.  That's why we

16   filed together, that's why we're doing this together, so it

17   can all be -- it can all be handled together.  So my creditors

18   committee with you guys here, whoever those people are, should

19   be working real closely with the creditors committee with

20   Double G Ranch in order to accomplish all this.

21   Q.   I understand that.

22   A.   Because there are -- I mean we have built and invested

23   and developed wonderful projects, and of course in today's

24   market, you know, you can't get anything for them.

25   Q.   Well, let me ask you this question though.  You owe $7.3

41

**EXHIBIT A**

1 million in promissory notes.

2 A.   Right.

3 Q.   How -- how come Lawrence and your other partner never

4 took this burden here, and you got the burden for the whole

5 thing, and these guys are walking -- I don't know where

6 they're at financially.

7 A.   Well, when we established the company and who was going

8 to do what, because I had -- I had the contacts, I had the

9 experience and the track record and so forth for people that

10 had been with me for years and years on very successful

11 businesses, and had made a lot of money, I was the one that

12 had suggested that I can raise the money and Tim can raise the

13 money, because he had some access to -- to money, too.  And

14 Lawrence didn't have any access to any money, but he was the

15 operational day-to-day guy in Arizona who lived there full

16 time, and that's how we originally set up the company.

17         So yeah, I took on the burden of trying to raise all

18 the money and handle all the money, and -- and Tim did, too,

19 to almost a million dollars, which is -- which he owes, but --

20 but the bulk of the responsibility for all the money raising

21 and for both Double G Ranch and all of our long-term real

22 estate projects, where we have limited partners, was all on my

23 shoulders.

24 Q.   Yeah, but you know, when I -- when I called you many

25 times -- and I'm sure everybody else here -- where's my money

42

Peter J. Graves
341 hearing - June 15, 2010

1   --

2   A.   I know.

3   Q.   -- everything's great, Chuck.  Don't worry about it,

4   you're covered, we're -- we're good to go.  And I got a plan

5   to pay you.  And the next thing I know is I get a letter from

6   your attorney saying, hey, I'm bankrupt.  And I'm like, whoa,

7   7.3 million I heard.  How could you lose that kind of money,

8   Peter, in a project that was supposedly good?  7.3 million is

9   a ton.

10  A.   You mean in a company.

11  Q.   In a company, in a whatever.

12  A.   Well, the company's been around for 14 years, and we --

13  we -- just our acquired asset cost was $44 million.  That's

14  what it cost us for our assets today.  Right around 44

15  million.  Now, there's a huge carrying cost of -- of, you

16  know, raising that type of money, both from banks and -- and

17  lenders from yourself, as -- as well as all the other costs

18  that -- that it takes to run a business.  And until you've run

19  a business -- and -- and in real estate development business

20  the one thing that we've learned is that everything can change

21  from one day to the next drastically, because we've been

22  through all kinds of ups and downs over the last 12 or 14

23  years, most of which we've gotten through successful, up until

24  '08 when all of this hit us, and it's just -- just taken us

25  down.

43

**EXHIBIT A**

1  Q.   No mismanagement or anything like that?

2  A.   I don't believe we've mismanaged anything other than --

3  other than accepting loans at real high rates, which we

4  weren't able to pay, and the time it took to -- to make these

5  projects profitable and so forth, because we were just

6  learning as we went along, too, we had no idea it was going to

7  take this long.  And then, because of the economy and the

8  times and everything, a lot of our really wonderful assets

9  have been on hold for two and three years, and we weren't able

10 to move forward with projects.  So had those been -- well, let

11 me say this, too.

12          Even today, what's happened in today's market, had

13 we moved forward three or four years ago, with doing those

14 projects and being under construction and so forth, which were

15 wonderful projects, planned and -- and going to be executed,

16 had we been moved forward, had the banks loaned us those

17 monies, when everything collapsed in '08, we probably would

18 have lost all those projects by now, and everybody would have

19 lost everything because the demand would have all dried up for

20 sales, for -- for leasing, for people moving and so forth, and

21 for a lot of businesses and doctors and so forth going out of

22 business.  We would have probably lost all those projects had

23 we even moved forward with them.

24          At least today we still have all the assets and all

25 the real estate, that if we can be -- if it can be protected

44

1  and sold, you know, during a time when -- when all these

2  assets can -- can realize their proper worth, then -- then

3  there would be enough money to repay all the debt.

4  Q.   When -- when you guys were talking over here, I -- you

5  mentioned in your statement that I would pick, let's say, my

6  check for $100,000 and you would give it to Double G, okay --

7  A.   Right.

8  Q.   -- and then you mentioned the fact that they owed me

9  interest on that money; Double G owed you interest on that

10 money?

11 A.   Well, here's -- here's how that worked, and this is why

12 I'm upside down so much, too.  In the early days when -- when

13 people were loaning me money and I was loaning it to the

14 company, Double G Ranch was not paying me any interest on that

15 money, on my loan balance, and for the first three or four or

16 five years -- well, I -- let me go back and say for the first

17 several years anyway they weren't paying any -- any interest.

18 Then they started paying me what was the federal applicable

19 rate, which was under 1 percent.  And -- and I was paying -- I

20 was paying anywhere from 7 to 12 percent to people, and on top

21 of -- on top of that I was paying a 6 percent commission.  So

22 I was really paying anywhere from 13 about 18 percent and only

23 getting less than 1 percent from the company.  Well, I was

24 going so far in the hole that finally I got my partners to

25 agree to pay me at least 7 percent.

45

1       Now, I never received any of that interest, but what
2   would happen is the -- at the end of the year the CPA would
3   calculate and give me a schedule of all the ins and outs every
4   single day for the entire year of monies going in and out, in
5   and out, and the interest that I was earning on that.  So
6   let's say in a particular year if that interest at 7 percent
7   then calculated out to be $80,000, then they would just simply
8   add that to my loan balance at the end of the year.  They
9   wouldn't pay me any cash for it, but it got added to my loan
10  balance.
11      But -- but for years and years, and even at 7
12  percent, I -- I was losing a lot of money because of -- of the
13  interest rates that I was paying.  And the commissions and so
14  forth.  I've paid -- over the last ten years I've paid over $5
15  million to people and have never been reimbursed at all from
16  the company for that.
17  Q.   Why would you do that?
18  A.   You know -- you know why -- I originally got involved in
19  that and realized years later I was going seriously in trouble
20  is because when you start out a new company, we had all the
21  optimism of we were going to make good money, big money, and
22  it would -- it would never be a problem.  And that's why I let
23  it continue so long.
24  Q.   My only other question is I never knew you paid
25  commissions to some -- a guy like Terry, who probably got me

46

1  involved with you, and --

2  A.   No, we never paid -- we never paid Terry any commissions.

3  Q.   You're sure?

4  A.   No.

5  Q.   Okay.  I mean --

6  A.   Terry never got any commissions for anybody.

7  Q.   Okay.  I --

8  A.   The only commissions that were ever paid were to a

9  registered financial representative.

10  Q.   Okay.  All right.  Okay.

11  A.   And -- and again, from day one I've had my own ledger

12  with people from family, friends and colleagues and so forth,

13  and -- and then -- then we had the financial representative's

14  ledger, who -- who he brought in, all of -- all of his

15  clients, only one of which I've ever met, and that was Arlene

16  Zabawa and Walter recently, and then I just met Adelade

17  Barberry.  I've never met any of these people in 15 years or

18  more.

19  Q.   I understand.

20  A.   Huh?

21  Q.   That's all the questions I've got.  That's all.

22  A.   And a lot of these people were with me in prior

23  businesses and were very successful.

24          MR. HITT:  All right.  Thanks.

25          MR. FOUST:  Okay.  Ms. Joseph, did you have some

47

**EXHIBIT A**

1  questions?

2         MS. JOSEPH:  Yes.

3      (Discussion off the record.)

4                    **EXAMINATION**

5  BY MS. JOSEPH:

6  Q.   Hi, Peter.  Okay.  From discussing things with other

7  people, I have a question to ask you.  Did the company

8  purchase a home for Terry Pruitt?

9  A.   Did the company purchase a home --

10 Q.   Yeah.  Or pay him because he had so much money involved

11 in the company?

12 A.   Years -- years ago -- years ago we -- we provided --

13 because Terry had raised so much money for -- for long-term

14 limited partners, which were -- like the Arrowhead projects

15 and the Shay Medical projects and so forth, we gave him a

16 payment of $50,000, and he used that as a down payment to buy

17 a condo.

18 Q.   So it was kind of a commission then.

19 A.   Yeah, I guess so.

20 Q.   Okay.  That cleared up that one.  I would like to know --

21 A.   That was years and years and years ago.  A long time ago.

22 Q.   I would like to know the name of the Realtor that you

23 used in Arizona to sell your home.

24 A.   Russ Lyons Realty.  I can give you the name and number

25 and everything.

48

1  Q.   Okay.  When I invested my money into Arrowhead -- and I

2  know that's not this, but I want to know -- you're under oath.

3  A.   Uh-huh.

4  Q.   -- did you invest the total amount of money that was so

5  hard for me to give you to begin with?  Did you invest it all

6  in Arrowhead?

7  A.   Absolutely.

8  Q.   You did.

9  A.   Absolutely.

10  Q.   Okay.  So I still have a 2 percent partnership, limited

11  partnership in Arrowhead.

12  A.   That's right.

13  Q.   Okay.  The -- the next question -- and I want you to

14  clear this up and be very honest with me -- when you came to

15  me or when you called me on the phone and you told me that you

16  had these short-term real estate projects that you would --

17  you would give me 6 percent in 60 days because you were

18  working with the mayor of a city --

19  A.   I was working with who?

20  Q.   With the mayor of a city -- I can't remember the name of

21  the city.

22  A.   Oh, Glendale, yeah.

23  Q.   Glendale.

24  A.   Glendale, right.

25  Q.   And that the properties were -- were already sold, but

49

**EXHIBIT A**

1   you needed to buy the property and then you'd resell it for

2   the profit.  Were you telling me the truth then?

3   A.   We were -- we were trying to buy the property to resell

4   it to the city of Glendale.

5   Q.   Yeah, but you did this -- I started with you -- my first

6   payment from a project like that was in March I think of 2008

7   where I got my first 6 percent.  And then you said, now, I can

8   pay you -- I can reinvest this in another piece of property,

9   Mary Jo, or I can give you -- I can pay you the -- the whole

10  106,000 back.  And I said well, no, just give me my 6,000

11  check and you can reinvest it if you're sure this -- this real

12  estate project is going to go, and each time you assured me.

13  A.   Uh-huh.

14  Q.   Do you have records of these real estate transactions?

15  A.   I have records of the money that was invested in three

16  different properties.

17  Q.   And now --

18  A.   During that time frame.

19  Q.   Of properties being sold?

20  A.   We never sold the property -- the properties.

21  Q.   What did you do with my $100,000, Peter, that I gave you?

22  A.   I invested it in these properties.

23  Q.   And -- and when you paid me the 6 percent twice, what did

24  -- did that mean you sold the properties?  Did you sell the

25  properties --

50

**EXHIBIT A**

1    A.    No, no, no, no.

2    Q.    -- when you paid me my 6 percent?

3    A.    No.  We --

4    Q.    But that's not what you told me, Peter.  You told me the

5    property was sold, here is your commission.  And you got me to

6    let you keep my 100,000 over and over and over again because

7    you were selling properties and you were selling properties.

8    A.    Well, we --

9    Q.    That's what you told me.

10   A.    We had a lot of properties for sale.

11   Q.    And Jack and I came to visit you last summer --

12   A.    Yeah.

13   Q.    -- and Jack sat there with you and asked you the same

14   questions, and you -- you said this is what we did.  And I

15   wanted record of that.

16   A.    We did.  We had a lot of properties for sale, but we

17   didn't up by selling anything.

18   Q.    Well, how did you pay me my commission then twice, and

19   then you kept -- and now you have everything.

20   A.    You know --

21   Q.    You even talked me into keeping one commission to you one

22   time.  I just want to know where the money is and what you did

23   with it.

24   A.    The money went into the business to invest in these three

25   separate properties, and we paid the -- we paid the interest

51

**EXHIBIT A**

out of the business back to you for those properties. We had money to pay the interest and so forth.

Q. Had I said to you after the first one I want my principal back, would you have paid me back my principal?

A. Absolutely.

Q. But there are some people that never go that either.

A. Oh, I know that, yeah.

Q. Well, needless to say, I'm very disappointed in you for lying to me.

MS. JOSEPH: I have nothing further.

MR. FOUST: Does anybody else have any questions of Mr. Graves?

MR. FINWALL: I had a couple additional questions, please.

**EXAMINATION**

BY MR. FINWALL:

Q. Mr. Graves, on your Schedule I you list your previous occupation as a financial manager --

A. Right.

Q. -- at Chrysler Corporation?

A. Right. Right.

Q. What year did you retire?

A. 2001. June of 2001.

Q. And your title at that time?

A. My title was supervisor, sales, marketing and finance, or

EXHIBIT A

1  something like that.

2  Q.   Okay.  You list also that you are currently receiving a

3  pension from Chrysler of $1,702 per month?

4  A.   Right.

5  Q.   And that's the total amount?

6  A.   That's right.  I took an early retirement, at age 54, to

7  actually do this development business.

8  Q.   Give me one minute here.  The Boyne City home, what year

9  was that purchased?

10  A.   We built it.

11  Q.   You built it.

12  A.   Yeah.  We bought --

13  Q.   What year did you build it?

14  A.   We finished it -- we finished it in 2002.  December of

15  2002.

16  Q.   Can you tell me what it cost to build?

17  A.   I think right around -- well, I don't know right offhand.

18  Do you want me to give you an approximate?

19  Q.   Yeah, an approximate would be fine.  Was it half a

20  million?  A million?  A million and a quarter?

21  A.   It was -- it was about 1.1 million.

22  Q.   And of the 1.1 million approximate cost to build it, how

23  much of that was financed?

24  A.   Nothing.

25  Q.   So the $1.1 million of building costs came from where?

53

**EXHIBIT A**

1  A.   Came from monies that we had in -- in -- from

2  investments, my retirement accounts, my wife's assets, and --

3  and the sale of our house in Bloomfield Hills.

4  Q.   Also on your Schedule -- actually on the -- on the

5  supplemental schedule that you provided for Schedule B --

6  A.   Uh-huh.

7  Q.   -- you list a 50 percent ownership in PGL Group.

8  A.   Correct.

9  Q.   And PGL Group, you testified earlier, was a child care?

10 A.   No.   It's a -- it's only a real estate -- it's a -- it's

11 a Michigan S corp. that was formed to only hold a piece of

12 property that is -- is -- is leased to one of the preschool

13 daycares that -- that I was involved in.   But its only -- its

14 only purpose is to hold the real estate.

15 Q.   So -- okay.   Does it currently own -- hold a piece of

16 real estate?

17 A.   Yes, it does.   Yes, it does.

18 Q.   And this is a commercial building?

19 A.   It's a -- it's a piece of property that sits on

20 approximately five acres.   It was -- it was a church at one

21 time, and when we bought -- when the church went out, we

22 bought the property and converted the church building into a

23 facility that used for a daycare nursery preschool.

24 Q.   You list that PGL Group owes you $50,000?

25 A.   That's just a loan.

**EXHIBIT A**

1  Q.   You loaned them 50,000?

2  A.   Yes.  When we started 15 years ago.

3  Q.   Do you have an approximate value of what the building is

4  worth?

5  A.   Well, the -- the land certainly is worth a lot more than

6  the building.  But --

7  Q.   What street was that on?

8  A.   It's on Fourteen Mile.

9  Q.   Fourteen Mile.

10  A.   In Madison Heights.  And it's got -- it's got like five

11  acres there.  And for -- for example, maybe not in today's

12  market, but if -- if it was a good market and you tore -- tore

13  the old church building down and a developer came in there,

14  I'll bet you that property would be worth $3-$5 million.

15  Q.   Do you recall what year you made the $50,000 loan to PGL?

16  A.   Oh, it was way back in the early '90s.

17  Q.   Have -- have there ever been any principal payments made

18  on that?

19  A.   No.

20  Q.   Okay.

21  A.   No.

22  Q.   Is the -- is the daycare or the -- is it -- was it a

23  Montessori school at one point?

24  A.   No, no, no.  It's just a private daycare preschool and --

25  Q.   Is that still operating?

**EXHIBIT A**

1  A.   Yes, it is.

2  Q.   Does it --

3  A.   Yes, it is.  And -- and what we -- from day one -- we've

4  never made any money in this corporation.  All -- all that's

5  happened is their lease or their -- they lease the building

6  and the property from PGL, and it actually pays the mortgage

7  on the property, and that's all.  There's no positive cash

8  flow on it.

9  Q.   Is the company that operates the daycare related to you

10  at all?

11  A.   No.

12  Q.   Going back to the Schedule F, where I counted I believe

13  55 individual names that you have listed --

14  A.   Okay.

15  Q.   -- of unsecured creditors, totaling somewhere around 7.36

16  million.

17  A.   Okay.

18  Q.   I -- just to be clear, when these investors negotiated

19  with you to invest with Peter Graves and you generated a

20  promissory note --

21  A.   Uh-huh.

22  Q.   -- and then you received funds from them, were those

23  funds deposited into a Peter Graves checking account?

24  A.   Yes, they were.

25  Q.   Or bank account.

56

**EXHIBIT A**

1    A.    Yes.

2    Q.    Not a Double G checking account, a Peter Graves checking

3    account?

4    A.    That's right, because the checks were made out to me.

5    Q.    Okay.  Did you ever receive any cash?

6    A.    No.  Not that I -- not that I can ever remember, no.

7    Q.    Just a couple more questions.  Back on June the 12th --

8    I'm sorry, May the 12th we met at your initial debtor meeting.

9    A.    Right.

10   Q.    And you described a scenario where part of the capital

11   raising for both Peter Graves and for Double G came through a

12   broker, and that broker was Mark Dardzinski.

13   A.    Correct.

14   Q.    And that Mr. Dardzinski, the connection with you and Mr.

15   Dardzinski came through Mr. McKay.

16   A.    Yes.

17   Q.    Is that correct?

18   A.    Yes.

19   Q.    Now, Mr. Dardzinski is a licensed financial professional?

20   A.    Yes.  Yes.

21   Q.    And Mr. McKay --

22   A.    Financial representative, right.

23   Q.    I'm sorry?

24   A.    He's a -- he's a licensed financial representative.

25   Q.    Okay.  And Mr. McKay, does he have a license?

57

**EXHIBIT A**

1   A.    No.

2   Q.    He does not.

3   A.    No, they were just friends.  And they -- they've done a

4   lot of business together on all kinds of things over the

5   years.

6   Q.    You mentioned that -- you described the situation where

7   Mr. Dardzinski would keep a separate book of clients, a

8   separate ledger --

9   A.    I kept it, I kept a separate ledger for all of his

10  people, yes.

11  Q.    Okay.  Could you tell me approximately how much or do you

12  recall how much money, capital, he had brought to Peter Graves

13  or to Double G?

14  A.    You mean over the whole years?  Over all those years?

15  Q.    Yeah.

16  A.    There's --

17  Q.    Can you tell me --

18  A.    I mean I could figure that out, but I can't tell you

19  today.

20  Q.    Can you tell me approximately how large of a commission

21  you paid him each year?

22  A.    Well, all I can tell you is over the span of about ten

23  years between interest and commissions, he -- I've paid him

24  between 800,000 and 900,000.

25  Q.    Over ten years.

**EXHIBIT A**

1    A.    That's right.

2    Q.    Do you have a written agreement with him?

3    A.    No, I don't.  When -- when -- when some of his -- in

4    2006, when a lot of his clients felt more comfortable, or at

5    the time he even suggested it, that they might feel more

6    comfortable in moving over to Double G Ranch, we converted a

7    lot of them from my name to Double G Ranch.  And then from

8    that point on we established a written commission contract

9    with Double G Ranch and Mark, but -- but that was different

10   than the commission agreement I had with him.

11          We never had a problem with paying Mark the

12   commission.  It was just the fact that the company's never

13   reimbursed me for it.

14   Q.    Who owns the other 50 percent of PGL, L.L.C.?

15   A.    Jerry and Lynn Bilski, B-i-l-s-k-i.

16   Q.    Thank you.  Also, earlier you testified, when Mr. Foust

17   asked you what you did with the proceeds, you mentioned that

18   you had made a $100,000 payment to Morgan Stanley --

19   A.    Uh-huh.

20   Q.    -- and that your wife made an additional 100 -- $150,000

21   payment --

22   A.    From her portion --

23   Q.    Right.

24   A.    -- of the sale.

25   Q.    On your Schedule D you still list a $150,000 home equity

59

**EXHIBIT A**

1  line (indiscernible).

2  A.   (Interrupting.)  Yes, because at the time she hadn't paid

3  that off.

4  Q.   Okay.

5  A.   She just recently paid that off.

6  Q.   Okay.

7       MR. FINWALL:  I think that's all I've got.

8                      **EXAMINATION**

9  BY MR. FOUST:

10  Q.   Mr. Graves, you're aware of the necessity of maintaining

11  adequate insurance on all of your property, are you not?

12  A.   Yes.

13  Q.   Okay.  Are you maintaining such insurance?

14  A.   Yes, I am.

15  Q.   Okay.  Have you filed all pre-petition tax returns due to

16  the Internal Revenue Service and the State of Michigan?

17  A.   Have I what now?

18  Q.   Have you -- have you filed all pre-petition tax returns?

19  A.   No.  I'm under an extension for 2009.

20  Q.   Okay.  But everything up through 2008 --

21  A.   Yes.

22  Q.   -- has been filed?

23  A.   Oh, yes.

24  Q.   The -- okay.  The extension is good for both the state

25  and the federal government?

60

**EXHIBIT A**

1  A.   Right.  Right.

2  Q.   Okay.  You do recall attending the initial debtor

3  interview with an analyst from this office, Mr. Wagner in

4  fact?

5  A.   Yes.

6  Q.   Okay.  And you received a copy of the U.S. Trustee's

7  operating instructions and reporting requirements?

8  A.   Yes, I have.

9  Q.   Okay.  You are aware that you must file monthly operating

10  reports with the court and quarterly fees must be paid to the

11  U.S. Trustee?

12  A.   Yes.

13  Q.   And are you aware that your failure to file the operating

14  reports or to pay the quarterly fees will result in the filing

15  of a motion to dismiss or convert the case --

16  A.   Yes.

17  Q.   -- to Chapter 7?

18  A.   Right.

19  Q.   And are you also aware that your failure to keep current

20  on all post-petition tax liabilities to all taxing authorities

21  could also result in the conversion or dismissal of the case?

22  A.   Yes.

23        MR. FOUST:  Does anyone else have any questions of

24  Mr. Graves?  Okay.  No one has any additional questions, the

25  meeting is concluded.

61

**EXHIBIT A**

1        (Hearing concluded.)

                    — — —

I certify that the foregoing is a correct transcript of the
proceedings held in the above-entitled matter.


DATED:   June 21, 2010    _____
                           Lynn L. Simmons, Transcriber

**EXHIBIT A**